UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____X

EARL E. KEITH,

                    **Plaintiff,**                    **Case No.**

      -against-

                                               **COMPLAINT**

**AUSTIN COINS, INC.,**
**CHRISTIAN FOSTER,**
**BRANDON E. CHANCEY,**
**ERIC P. LESAK (ALIAS "MIKE TODD"),**
**DAVID SCHMIDT,**
**CHRISTOPHER M. PARADISE and**
**PATRICK J. WHITE,**

                    **Defendants.**
_____X

Plaintiff, Earl E. Keith ("Mr. Keith" or "Plaintiff") complaining of the Corporate Defendant, Austin Coins, Inc. ("Austin Coins"), and the Individual Defendants, Christian Foster, Brandon E. Chancey ("Chancey"), Eric P. Lesak (alias "Mike Todd") ("Lesak"), David Schmidt ("Schmidt"), Christopher M. Paradise ("Paradise") and Patrick J. White ("White"), respectfully alleges:

## NATURE OF THE CASE

**1.**   This case involves a fraud scheme by a group of Long Island precious metal coin dealers who conspired to and, in fact, did commit telemarketing coin sales fraud against Mr. Keith and, on information and belief, other elderly citizens[1] through and under the auspices of the corporate defendant, Austin Coins.

---

[1] Coin fraud targeting the elderly has a long history in the Eastern District of New York. *See, e.g., United States v. Romano*, No. 09-CR-168 (SJ) (VMS), 2013 U.S. Dist. LEXIS 208446, at *19 n.5 (E.D.N.Y. 2013) and the testimony adduced at the criminal RICO coin fraud trial against Michael Romano and William Kearney:

**2.**     Defendants conducted their scheme to defraud Mr. Keith by way of unrelenting high-pressure telemarketing phone calls and fraudulent, unconscionably overpriced sales of precious metal graded bullion coins to Plaintiff as "investments."[2]

**3.**     The Individual Defendants are all (or represented themselves to be) principals and officers of the Corporate Defendant, Austin Coins who working in combination, conspired to, and did in fact, defraud Mr. Keith (and on information and belief, other Austin Coins customers[3]) of his life savings through a phony and fraudulent telemarketing coin investment scam.

**4.**     Plaintiff Earl E. Keith, an 82-year-old retiree and cancer patient, fell prey to the Individual Defendants' fraudulent scheme on behalf of Austin Coins, and Mr. Keith  seeks to recover actual damages, consequential damages, exemplary damages, treble damages under New York General Business Law § 349,  pre- and post-judgment interest, attorneys' fees, litigation expenses and costs of suit. Specifically, Plaintiff asserts various New York common law and statutory causes of action sounding in fraud, deceptive consumer practices, money had and received and conversion, as set forth below.

## PARTIES, JURISDICTION AND VENUE

### *The Parties*

**5.**     Plaintiff, Earl E. Keith is a citizen and resident of the State of Wyoming.

---

Patrick Coleman, Defendants' former employee, testified at trial that . . .  Mr. Kearney's avowed sales tactics were to "crush weak people" and to "confuse the shit" out of "older people." . . .  Daren Mutone, a former employee of Atlantic Coin Galleries, testified at trial that the Atlantic Coin Galleries salespeople would make fun of the victims because they were old and easier to convince. . . .  Mr. Mutone testified that the elderly were "easier to push around," and that Mr. Romano and Mr. Kearney would hear the jokes and push the sales staff to sell even more coins to a victim who showed susceptibility to pressure and manipulation.

[2]  On information and belief, the Austin Coins telemarketers recorded their telephone conversations with Mr. Keith and maintain all of those recorded telephone conversations to the present.

[3]  In this Complaint, whenever the term "customer(s)" appears, Plaintiff intends it to mean both "customer(s)" and "consumer(s)."

6.     Defendant Austin Coins, Inc. ("Austin Coins") is a privately-held corporation organized under the laws of the State of New York with its principal place of business located in Suffolk County, New York and a physical business address at 48 S. Service Road, Melville, NY 11747. Austin Coins received monies—and facilitated the receipt of monies by its principals and agents, specifically, the Individual Defendants, that were defrauded and stolen from Mr. Keith.

7.     Defendant Christian Foster ("Foster") is a New York citizen and believed to be a resident of Suffolk County, New York, with a business address in Suffolk County at 48 S. Service Road, Melville, NY 11747. On information and belief, Foster is or, at all times pertinent was, a telemarketing sales agent and "investment advisor" for Austin Coins, who held himself out to Mr. Keith to be a principal/officer of Austin Coins, who, together with the other Individual Defendants herein, conspired to, and did in fact, enrich himself with money defrauded and stolen from Mr. Keith.

8.     Defendant Brandon E. Chancey ("Chancey") is a New York citizen and resident of Suffolk County, New York, with a last known residential address at 49 Franklin Street, Northport, NY 11768-3058 and a business address in Suffolk County at 48 S. Service Road, Melville, NY 11747. On information and belief, Chancey is or, at all times pertinent was, a telemarketing sales agent and "investment advisor" for Austin Coins, who held himself out to Mr. Keith to be a principal/officer of Austin Coins, who, together with the other Individual Defendants herein, conspired to, and did in fact, enrich himself with money defrauded and stolen from Mr. Keith.

9.     Defendant Eric P. Lesak ("Lesak"), operating under the alias "Mike Todd," [4] and known within Austin Coins as "the Closer," is a New York citizen and resident of Nassau County, New

---

[4]  It is understandable that Lesak conducts his fraudulent coin telemarketing operations under the alias "Mike Todd" since it is public record that Lesak is a twice-convicted recidivist securities fraudster. *See https://www.sec.gov/files/litigation/complaints/2018/comp24239.pdf*. Telemarketing under a fictitious name makes it difficult, if not impossible, for victims of coin fraudsters' schemes to identify, bring suit, and serve the actual, specific

York, with a last known residential address at 3494 Clifton Boulevard, Wantagh, NY 11793 and a business address in Suffolk County at 48 S. Service Road, Melville, NY 11747. Lesak is a principal/officer of Austin Coins, as well as a telemarketing sales agent and "investment advisor" for Austin Coins, who, together with the other Individual Defendants herein, conspired to, and did in fact, enrich himself with money defrauded and stolen from Mr. Keith.

10.     Defendant David Schmidt ("Schmidt') is a New York citizen and is believed to be a resident of Suffolk County, New York, with a business address in Suffolk County at 48 S. Service Road, Melville, NY 11747. On information and belief, Schmidt is a principal/officer of and controlled Austin Coins, Inc. who, together with the other Individual Defendants herein, conspired to, and did in fact, enrich himself with money defrauded and stolen from Mr. Keith.

11.     Defendant Christopher M. Paradise ("Paradise") is a New York citizen and resident of Suffolk County, New York, with a last known residential address at 12 Mallard Cove, Centerpoint, NY 11721-1641 and a business address in Suffolk County at 48 S. Service Road, Melville, NY 11747. On information and belief, Paradise is a principal/officer of and controlled Austin Coins and who, together with the other Individual Defendants herein, conspired to, and did in fact, enrich himself with money defrauded and stolen from Mr. Keith.

12.     Defendant Patrick J. White ("White") is a New York citizen and resident of Suffolk County, New York with a last known residential address at 3 Sweet Hollow Road, Huntington, NY 11743-6530 and a business address in Suffolk County at 48 S. Service Road, Melville, NY 11747. On information and belief, White is a principal/officer of and controlled Austin Coins, Inc. who,

---

perpetrator. There is precedent for New York-based coin fraud telemarketers using aliases when interacting with customers. *See United States v. Romano,* No. 09-CR-168 (SJ) (VMS), 2013 U.S. Dist. LEXIS 208446, at *20 n.6 (E.D.N.Y. 2013) (in criminal RICO coin fraud trial, "Michelle Stumpf testified . . . that the Defendants and their salespeople used false names when interacting with customers").

together with the other Individual Defendants herein, conspired to, and did in fact, enrich himself with money defrauded and stolen from Mr. Keith.

*Jurisdiction and Venue*

**13.** This Court has diversity jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a), as Plaintiff is a citizen of Wyoming, and Defendants all are citizens of states other than Wyoming, and the amount in controversy exceeds $75,000 exclusive of interest, costs, and attorneys' fees.

**14.** This Court has *in personam* jurisdiction over all Defendants because at all relevant times Defendants conducted their business and fraudulent activities from their offices in this District. Further, all Defendants resided, maintained citizenship, were found, had agents, and are amenable to service in this District.

**15.** Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

**FACTS COMMON TO ALL CAUSES OF ACTION**

**16.** Plaintiff Earl E. Keith is an 82-year-old retiree and cancer patient.

**17.** Defendants, Lesak, Foster, and Chancey, all of whom are (or represented themselves to Mr. Keith to be) owners, principals, and/or officers of Austin Coins, along with non-party, Sean Klein ("Klein"), another agent of Austin Coins, acting in combination, scammed and defrauded the elderly Mr. Keith into making three (3) coin purchases from Austin Coins between March 7, 2023 and April 25, 2023. Through misrepresentations as to the quality and value of the coins, Austin Coins telemarketers scammed Mr. Keith into paying Austin Coins a total of $304,322.00 by credit card and wire transfers for "graded" modern bullion coins that had a fair market value at the time of sale of just $60,260.98, thereby incurring immediate losses at the time of purchase of Two Hundred Forty-Four Thousand Sixty-One and 02/100 Dollars ($244,061.02).

**18.** On information and belief, Austin Coins' principals include Individual Defendants, Patrick J.

5

White, David Schmidt, and Christopher Paradise. In addition, Individual Defendant, Eric P. Lesak (under the alias "Mike Todd") who also interacted directly with Mr. Keith, are believed to be, and hold themselves out as, principals and officers of Austin Coins. On information and belief, the other Individual Defendants, Christian Foster and Brandon Chancey, at all times pertinent to this suit were telemarketing sales agents or employees who interacted directly with Mr. Keith and who held themselves out to Mr. Keith to be officers and/or principals of Austin Coins.[5] Non-party, Sean Klein ("Klein") also interacted with Mr. Keith on behalf of Austin Coins, as set out below.

**20.** On **March 6, 2023**, Foster "cold called" Mr. Keith on behalf of Austin Coins and offered to sell Mr. Keith precious metal coins as an "investment."[6] Foster represented to Mr. Keith that he was "Vice President of Sales" for Austin Coins, Inc. When Mr. Keith told Foster that he "probably" was interested, Foster gave Mr. Keith his cell phone number and said he would call Mr. Keith back. That same day, Lesak called Mr. Keith and told him that he was an owner and also "Executive Director of Purchasing, and Senior Partner" for Austin Coins. As of March 6, 2023, Mr. Keith had conventional retirement investments with Ameriprise Financial worth approximately $300,000.00.

### *Plaintiff's First Coin Purchase from Austin Coins*

**21.** The next day, **March 7, 2023**, Lesak again called Mr. Keith on the telephone and told Mr. Keith that he "wanted to sell him some top notch, special coins." Lesak told Mr. Keith that Austin Coins had obtained through Westminster Mint "the only 300 sets in the whole world" of 6-bullion

---

[5] On information and belief, all Austin Coins telemarketers, including Foster and Chancey, utilize a standardized sales "script" composed and developed by White and Lesak to lure and convince their customers to purchase grossly overpriced coins from Austin Coins.

[6] Foster had called Mr. Keith numerous times over the prior six months (since Fall 2022) on behalf of Austin Coins and also Austin Lloyd, Inc., on information and belief, a sister company of Austin Coins, trying to convince Mr. Keith to "invest" in precious metal coins.

coin sets of 2023 FDOI[7] MS70[8] "graded" bullion coins individually sealed in slab holders with certificates signed by Anna Cabral, the 42nd Treasurer of the United States. Each 6 six coin set consisted of:  one  2023 Silver American Eagle, one  $50 Gold American Buffalo, one  $50 Gold American Eagle, one  $25 Gold American Eagle, one  $10 Gold American Eagle, and one  $5 Gold American Eagle(hereinafter the "2023 Cabral 6-coin set").

**22.**  During this conversation, Lesak told Mr. Keith that he liked doing business with a "solid family man" with "Christian values" and that he wanted to help Mr. Keith build his net worth to $1 million. Lesak told Mr. Keith that Lesak would "cover [Mr. Keith's] downside." Lesak also represented to Mr. Keith that if he took his money out of the stock market (i.e. Ameriprise Financials) and put that money in and began trading precious metals, under Lesak's "investment plan" Mr. Keith could expect to realize quarterly profits of $120,000 to $140,000.

**23.**  Ultimately, as a representative of Austin Coins, Lesak offered to sell Mr. Keith eight (8) of the 2023 Cabral 6-coin sets for Lesak's "dealer cost," which he represented to be $12,500.00, per set (total price $100,000.00), and that Lesak would make his money (i.e. a 3½% commission on the profits) when Austin Coins turned around and brokered the sale of the 2023 Cabral 6-coin sets for Mr. Keith in 30 to 60 days. Lesak told Mr. Keith that Lesak currently had 35 messages seeking to buy the 2023 Cabral 6-coin sets and that the 2023 Cabral 6-coin sets were "oversold" by 13 to 1. Lesak also told Mr. Keith that profits from the sale of the coins would be "tax exempt." Lesak further told to Mr. Keith that Lesak could "exchange" Mr. Keith's coins for "pre-1933" gold coins which, he misrepresented, would sell "tax-free." All of these representations by Lesak were

---

[7]  "FDOI" is a marketing designation meaning "First Day of Issue." A FDOI designation has little to no bearing on a coin's dollar value.

[8]  Under the industry coin grading systems, "MS 70" is supposed to signify a coin that is graded "perfect."

fabrications or lies.

**24.** On this same telephone call, Lesak told Mr. Keith that he wanted to add two (2) more 2023 Cabral 6-coin sets to the total number. Thus, rather than eight (8) 2023 Cabral 6-coin sets , Lesak recommended that Mr. Keith purchase ten (10) of the 2023 Cabral 6-coin sets for a total purchase price of $124,000.00.[9]

**25.** Lesak also told Mr. Keith that the 2023 Cabral 6-coin sets  were "NGC rated" and "Greysheet" valued at $19,100.00 each, but Lesak would sell each set to Mr. Keith for $12,500.00, his "dealer cost." Lesak represented to Mr. Keith that Lesak intended to broker the sale of all 300 2023 Cabral 6-coin sets  at one time in 30 to 60 days for $19,100 to $21,100 per set—meaning that Mr. Keith would realize a profit of between $6,600 and $8,600 per set, or for eight (8) sets, a total profit of between $52,800 and $68,800 (less Lesak's sales commission). In reliance upon Lesak's representations as to the market value of the 2023 Cabral 6-coin sets  and Lesak's representations that Mr. Keith would realize guaranteed resale profits in just 30 to 60 days, Mr. Keith agreed to purchase eight (8) of the 2023 Cabral 6-coin sets.

**26.** Lesak then told Mr. Keith that he would sell and charge him $12,500.00 as a "down payment" for just one (1) of the 2023 Cabral 6-coin sets  "on trial," meaning that Austin Coins would ship Mr. Keith one (1) of the Anna Cabral coin sets for Mr. Keith to examine for three to five days before consummating the sale of the other seven (7) 2023 Cabral 6-coin sets. Mr. Keith agreed and on **March 7, 2023**, he charged $12,500.00 on his Chase Bank credit card to pay Austin Coins for one (1) 2023 Cabral 6-coin set..

**27.** On **March 9, 2023**, Mr. Keith made arrangements to pay off the $12,500.00 Austin Coins

---

[9] Given the combination of Mr. Keith's age and hearing deficits, especially while talking on the telephone, information overload, and Lesak's fast-talking, high-pressure sales patter, Mr. Keith remains confused to this day as to whether he agreed to purchase eight (8) coin sets or ten (10) on March 7, 2023. Perhaps Lesak got confused also, as he later convinced Mr. Keith to purchase an additional two (2) coin sets—making a total of ten (10) sets—a week or so later.

charge to his Chase credit card with funds from his retirement account with Ameriprise Financial. He also decided that if he was satisfied with the trial set of coins he would use additional monies from his Ameriprise Financial investment account to purchase the other seven (7) 2023 Cabral 6-coin sets.

**28.**  Shortly thereafter, Austin Coins shipped the single "trial" 2023 Cabral 6-coin set via Federal Express to Mr. Keith in Wyoming along with Austin Coins Invoice No. 12738, dated **March 7, 2023**. (Mr. Keith received this shipment on **March 14, 2023**.) *See* Paragraph 44, *infra*.

**29.**  On **March 13, 2023**, Lesak called Mr. Keith ostensibly to inform (i.e. frighten) him with news of three (3) bank failures over the prior weekend. Lesak then represented to Mr. Keith that the market value of the 2023 Cabral 6-coin sets  had gone up since they last spoke to $23,500 per set, which meant, per Lesak, that the eight (8) sets of Anna Cabral six (6) coin sets that Mr. Keith had pledged to purchase from Austin Coins for $12,500.00 per set were now worth a total of $188,500.00. Lesak then convinced Mr. Keith to make payment to Austin Coins for one (1) more of the 2023 Cabral 6-coin sets, which Mr. Keith did by charging **$12,000.00** to his Cabela's credit card.

**30.**  Shortly thereafter, Austin Coins shipped the second 2023 Cabral 6-coin set via FedEx to Mr. Keith in Wyoming along with Austin Coins Invoice No. 12794, dated **March 13, 2023**.

**31.**  On **March 14, 2023**, Mr. Keith received two (2) of the 2023 Cabral 6-coin sets  (Austin Coins Invoices Nos. 12738 and 12794) at his home in Wyoming via Federal Express.

**32.**  In **Mid-March 2023**, Lesak called Mr. Keith and convinced him to agree to purchase two (2) additional 2023 Cabral 6-coin sets  (making for 10 total sets) for a price of $12,000[10] per set (or

---

[10] The per set price offered to Mr. Keith appears inexplicably to have dropped from $12,500 to $12,000.

$120,000.00 total). Lesak again misrepresented to Mr. Keith that the Anna Cabral sets were "oversold 13 to 1" and that the market value of the ten (10) sets came to $235,000.00. Mr. Keith authorized another $12,000.00 credit card payment to Austin Coins. (At this same time, Mr. Keith checked his Ameriprise Financial account balance and found that it stood at $285,922.00.)

**33.**   Shortly thereafter, still in **Mid-March 2023**, Lesak and Klein (who represented to Mr. Keith that he was "Executive Director of Retail" for Austin Coins) telephoned Mr. Keith in tandem. Klein claimed that Mr. Keith still owed Austin Coins $99,500.00[11] on the total purchase of $120,000.00 for the ten 2023 Cabral 6-coin sets. Lesak misrepresented to Mr. Keith that the market value of the Anna Cabral coin sets was still increasing and that the ten 2023 Cabral 6-coin sets were now collectively worth $236,000.00 (which if true, which it was not, would have meant that Mr. Keith was doubling his "investment").

**34.**   On **March 16, 2023**, Mr. Keith wire transferred $115,322.00 to Austin Coins in payment for the eight remaining 2023 Cabral 6-coin sets  Lesak sold him.

*35.*   On **March 23, 2023**, Mr. Keith telephoned Austin Coins and left a voice message for Lesak that Mr. Keith needed Austin Coins to sell some of his coins so he can pay his Chase credit card bill which was coming due. Lesak did not immediately respond.

*Plaintiff's Second Coin Purchase from Austin Coins*

**36.**   On **March 28, 2023**, Lesak again called Mr. Keith and pushed until he convinced Mr. Keith to purchase a second group of coins from Austin Coins, specifically twenty-two (22) 2016 Anna Cabral 30th Anniversary American Silver Eagle NGC MS70 3-coin sets (66 total coins) (hereinafter the "2016 Cabral 3-coin sets") for $96,000.00. Mr. Keith paid for these coins by

---

[11] By this point, Mr. Keith had paid $36,500.00 toward the purchase of 10 sets, so the amount owed would have been only $83,500.00. Not to be deterred, Lesak claimed the price had risen due to demand, which was false.

putting $12,000.00[12] on a credit card and paying the remaining $84,000.00 via wire transfer. Lesak misrepresented to Mr. Keith that these 66 graded bullion coin sets were "very special," "extremely limited," and "desirable and valuable" and, thus, a "good investment."

37.   That same day, **March 28, 2023**, still concerned about the charges to his two credit cards and the need to pay off the balances on those cards, Mr. Keith called Lesak and left a voice message. He also called Klein and left a voice message. Mr. Keith also called and left voice messages on Austin Coins' main office number and after-hour number. He also called and left a message for Paradise, another principal of Austin Coins. At 1:05 p.m., he telephoned Foster (who claimed to be "Vice-President of Sales" for Austin Coins). Foster answered but explained that he was "at lunch" and would call Mr. Keith back "in ten minutes." Foster did not call back.

38.   The next day, **March 29, 2023**, Chancey, who told Mr. Keith that he was a "partner" in Austin Coins, called Mr. Keith at 2:00 p.m. and told him that Lesak was "out in the field" and could not return Mr. Keith's calls. Chancey also informed Mr. Keith that Lesak was "very disappointed" when Mr. Keith refused Lesak's recent offer to sell Mr. Keith coins valued at "$160,000 for $84,000." Mr. Keith told Chancey that he was still awaiting Federal Express delivery of a package of coins purchased from Austin Coins which had not yet arrived.

39.   On **March 30, 2023**, Mr. Keith received via Federal Express an additional six (6) 2023 Cabral 6-coin sets   Lesak sold him on March 17,2023 along with Austin Coins Invoice No. 12862 in the amount of $115,332.00.[13]

40.   In **early April 2023**, Mr. Keith again began pushing for Austin Coins to sell a portion of the

---

[12] Mr. Keith later discovered that instead of a credit card charge of $12,000.00, Austin Coins charged his credit card $12,500.00. thus Invoice No. 12943 was over-billed by $500.00.

[13] All told, Mr. Keith had agreed to purchase ten (10) 2023 Anna Cabral six (6) coin graded bullion sets—and paid Austin Coin for them in the total amount of $139,822.00—but he never received the remaining two (2) coin sets or any final invoice.

coins he had purchased in order to pay off the credit card debt he has incurred paying for the coins. Lesak assured Mr. Keith over the telephone that Austin Coins would sell some of the coins and get Mr. Keith "$40,000 to $50,000" "next week."

41.　Also in **early April 2023**, Lesak began pushing Mr. Keith to purchase a third group of coins from Austin Coins consisting of five (5) sets of eight (8) Anna Cabral Silver American Eagle bullion coins[14] (a total of forty (40) coins) (hereinafter "Cabral 8-coin Silver Eagle set"). Lesak misrepresented to Mr. Keith that these coin sets were "rare" and desirable as there were only twenty (20) of these particular Cabral 8-coin Silver Eagle sets in the world, and that Austin Coins had just obtained seven (7) of those twenty (20) sets. Lesak offered to sell Mr. Keith five (5) of those sets for $70,000.00, while representing to Mr. Keith that the coin sets had a market value of $150,000.00.[15] However, Mr. Keith balked at buying these coins.

42.　Shortly thereafter, also in early **April 2023**, and after Mr. Keith had refused Lesak's offer to purchase the 2023 Cabral 6-coin sets, he received a high-pressure telephone call from Chancey chiding him for "not following the plan" that Lesak had laid out for Mr. Keith to grow his $300,000.00 "investment" to $460,000.00 and leaning on Mr. Keith to make the purchase. After hanging up with Chancey, a shaken Mr. Keith attempted to telephone Lesak, but when Lesak did not answer and would not return his calls, Mr. Keith sent Lesak an email telling him that he did not appreciate the high-pressure sales tactics being applied by Chancey.

43.　On **April 18, 2023**, Mr. Keith received shipment of the second group of coins from Austin Coins, consisting of eighteen (18) of the 2016 Anna Cabral 3-coin sets which he had purchased on

---

[14] Each set contains: a 2013-W SAE  PF 70 1st Release Anna Cabral, a 2019-S SAE Enhanced Reverse PF70 Anna Cabral, a 2021-S SAE T-2 Reverse PF70 Anna Cabral, a 2021-W SAE T-1 Heraldic Reverse PF70 Anna Cabral, a 2011-P SAE PF70 Early Release Anna Cabral, a 2006-P SAE Reverse PF70 Anna Cabral, a 2012-S SAE Reverse PF70 Anna Cabral and a 2019-W SAE Enhanced Reverse PF70 Anna Cabral.
[15] If Lesak's representation as to the market value of the coins were correct, which it clearly was not, it would mean that he was offering to sell Mr. Keith silver bullion coins at a more than 50% discount below market value.

March 28, 2023. Mr. Keith had purchased and paid for twenty-two (22) of the 2016 Cabral 3-coin sets, but he only received a total of eighteen (18) sets. Accompanying the coins was Austin Coins Invoice No. 12943, dated **March 28, 2023**, showing a total payment of $96,000.00 for fifty-four (54) silver bullion coins (*not* sixty-six (66) coins as agreed). Further, Mr. Keith was duped and charged a total of $96,500.00 for the coins instead of the invoiced amount when Austin Coins used his credit card to charge for partial payment of the invoice.

### *Plaintiff's Third (and Final) Coin Purchase from Austin Coins*

**44.**  That same day, **April 18, 2023**, Lesak called Mr. Keith and told him that he understood Mr. Keith's financial situation and promised to sell four (4) sets of Mr. Keith's coins in order to raise money so Mr. Keith can pay off his credit card debt. Having calmed Mr. Keith's financial concerns, Lesak immediately switched gears and began pressuring Mr. Keith to purchase the third group of coins from Austin Coins consisting of five (5) Cabral 8-coin Silver Eagle sets, that is, a total of forty (40) coins, for a total price of $70,000.00. Lesak then in a show of false magnanimity told Mr. Keith that he could just pay $68,000.00 for the coins and keep the other $2,000.00 to make his monthly credit card payments.

**45.**  On **April 24, 2023**, Mr. Keith received a copy of an Austin Coins Invoice for the third Austin Coins purchase (Austin Coins Invoice No. 13195) for the five (5) 8-coin Anna Cabral Silver American Eagle sets.

**46.**  On **April 27, 2023**, Mr. Keith authorized a wire transfer of the $68,000.00 payment to Austin Coins for the third coin purchase of five (5) Cabral 8-coin Silver Eagle sets.

**47.**  Over the next ten (10) days (**April 28, 2023 – May 8, 2023**), Mr. Keith did not hear from Austin Coins or any of its representatives. Nor did Mr. Keith receive shipment of the five (5) Cabral 8-coin Silver Eagle sets for which he had paid $68,000.00 on April 27, 2023.

**48.** On **May 9, 2023** and **May 10, 2023**, Mr. Keith called and left numerous unanswered voice messages for Lesak on Lesak's direct line and on the Austin Coins main office number asking for the status of the shipment of the five (5) Cabral 8-coin Silver Eagle sets.

**49.** Finally, on **May 10, 2023**, with no explanation from Lesak or Austin Coins, Mr. Keith received a shipment of three (3) of the five (5) Cabral 8-coin Silver Eagle sets along with Austin Coins Invoice No. 013195 (dated April 25, 2023)[16] listing only three (3) Anna Cabral SAE sets (rather than five (5) sets) for which Mr. Keith had paid $68,000.00 via wire transfer on April 27, 2023.

**50.** On **May 13, 2023**, Mr. Keith sent two (2) unanswered emails to Lesak.

**51.** Some six weeks later, having not heard from Lesak or anyone else at Austin Coins in the interim, on **June 27, 2023**, and having disputed Austin Coins' charges on his Cabela's (Capital One) credit card, Chris (with the Capital One dispute department) and Mr. Keith had a telephone conversation with someone named "Sarah" at Austin Coins. "Sarah" told Mr. Keith and Chris that a total refund of Mr. Keith's money (approximately $330,000.00) "should be no problem" and that Mr. Keith would just need to return the coins to Austin Coins. "Sarah" said that she would call back later after talking with her manager. However, neither "Sarah" nor anyone else with Austin Coins ever called Mr. Keith back to follow up. Given these assurances, the credit card charges were allowed.

**52.** Apparently realizing that their scam against the elderly Mr. Keith had run its course (i.e. they had defrauded all of his life savings that they could) and that the jig was up, Lesak, Foster, Chancey, and the entire Austin Coins fraud enterprise simply ignored Mr. Keith and shifted their

---

[16] Mr. Keith was originally provided Invoice No. 12983 that reflected that only one set of the Cabral 8-coin set was sold for $70,000.00. When Mr. Keith protested, Lesak agreed to send a corrected invoice.

focus on new targets to scam and defraud.  In sum, Mr. Keith "invested" his life savings of $304,322.00 for coins that only had a fair marker value of $60,260.98.  At the time of sale, Mr. Keith lost $244,061.02, that is 80%, of his funds.  This is not an investment, this is worst kind of financial fraud practiced upon the elderly.

**53.**  Embedded immediately below is **TABLE 1** which shows the particulars of each of the three (3) coin purchases from Austin Coins that Mr. Keith made in reliance upon the "investment" advice, misrepresentations as to value, and high-pressure sales tactics of the Austin Coins principals and telemarketers, Lesak, Foster, and Chancey:

### Table 1—Mr. Keith's Coin Purchases from Austin Coins

| Date | Invoice | Description | Total Price Paid | FMV | Delta | % Markup |
|---|---|---|---|---|---|---|
| | | **"2023 Cabral 6-coin American Eagle Set"** | | | | |
| 3/7/2023 | 12738 | 2023 American Eagle MS70 NGC 6-coin set (ASE, $50 GAB, $50 GAE, $25 GAE, $10 GAE, $5 GAE) Anna Cabral FDOI | $ 12,500.00 | $ 6,285.67 | $ 6,214.33 | 99% |
| 3/13/2023 | 12794 | 2023 American Eagle MS70 NGC 6-coin set (ASE, $50 GAB, $50 GAE, $25 GAE, $10 GAE, $5 GAE) Anna Cabral FDOI | $ 12,000.00 | $ 6,285.67 | $ 5,714.33 | 91% |
| 3/16/2023 | | 2023 American Eagle MS70 NGC 6-coin set (ASE, $50 GAB, $50 GAE, $25 GAE, $10 GAE, $5 GAE) Anna Cabral FDOI | $ 115,322.00 | $ 37,714.03 | $ 77,607.97 | 206% |
| 3/28/2023 | 12943 | **"2016 Cabral 3-coin Set"** | $ 96,500.00 | $ 6,458.40 | $ 90,041.60 | 1394% |
| | | 2016-W Silver American Eagle MS70 NGC | | | | |
| | | 2016-W Silver American Eagle Burnished MS70 NGC | | | | |
| | | 2016-W Silver American Eagle PF70 Ultra Cameo NGC | | | | |
| 4/25/2023 | 13195 | **"Cabral 8-coin Silver Eagle Set"** | $ 68,000.00 | $ 3,517.20 | $ 64,482.80 | 1833% |
| | | 2013-W Silver American Eagle PF 70 1st release | | | | |
| | | 2019-S Silver American Eagle  Enhanced Reverse PF70 | | | | |
| | | 2021-S Silver American Eagle T-2 Reverse PF70 | | | | |
| | | 2021-W Silver American Eagle T-1 Heraldic Reverse PF70 | | | | |
| | | 2011-P Silver American Eagle PF70 Early release | | | | |
| | | 2006-P Silver American Eagle Reverse PF70   Anna Cabral | | | | |
| | | 2012-S Silver American Eagle Reverse PF70   Anna Cabral | | | | |
| | | 2019-W Silver American Eagle Enahnced Reverse PF70 | | | | |
| | | TOTALS | $ 304,322.00 | $ 60,260.98 | $ 244,061.02 | 405% |

**54.**  As set out in detail above, the Austin Coins principals and telemarketing agents conspired with one another from day one to run a confidence scheme on Mr. Keith to convince him to purchase grossly overpriced bullion coins as "investments" and thereby abscond with his life savings. The ultimate goal of the Defendants, and the primary, if not entire, *raison d'etre* of Austin

Coins, is to defraud and impoverish elderly customers and by so doing to enrich themselves. As a direct and/or proximate result of the Defendants' above-described wrongful acts and practices, Mr. Keith has suffered (and continues to suffer) devastating economic damages, which Defendants refuse to remedy. This case has resulted.

## CLAIMS FOR RELIEF/CAUSES OF ACTION
### COUNT I
### FRAUD AND/OR FRAUDULENT CONCEALMENT

**55.** The Plaintiff incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**56.** Via a series of oral misrepresentations and high-pressure sales tactics (as set out in detail above), Lesak, Foster, and Chancey, individually and as principals and telemarketing representatives of Austin Coins, convinced Plaintiff to liquidate his retirement investment account and incur credit card charges to purchase grossly overpriced bullion coins from Austin Coins as "investments" at exorbitant markups, thereby defrauding Plaintiff pursuant to New York common law.

**57.** In addition, the Defendants are liable for fraudulent concealment against Mr. Keith. The elements of fraudulent concealment are identical to the elements for fraud with the addition that the defendant must have a duty to disclose material information and failed to do so.

**58.** The Defendants, both Austin Coins and its individual principals and telemarketing sales agents, represented to Mr. Keith that they were "investment advisors," had a duty to disclose to him that the coins they were marketing to him and advising him to purchase in keeping with the faux "investment plan" they presented for Mr. Keith were being sold for prices fraudulently higher than any fair market value and that, despite their representations and that the coins they advised him to buy and sold him would never result in any investment income or financial return or security

for him. The Defendants, and specifically Lesak, Foster, and Chancey, had a duty to make such disclosures based upon the "special facts" doctrine, which provides that a duty to disclose arises when one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair. The "special facts" doctrine is applicable to the present case because the withheld and hidden material information was "peculiarly within the knowledge" of the Defendants, and Plaintiff could not have discovered such information through the exercise of ordinary intelligence.

**59.** The Defendants, both Austin Coins and its individual principals and telemarketing sales agents, made the above-detailed false representations to Mr. Keith with the intent that he rely upon them and with full knowledge that such representations were false when made. Mr. Keith did, in fact, rely on these material and false representations when deciding to purchase the coins from Austin Coins which resulted in his financial ruination and the Defendants' obscene financial gain. As a direct and/or proximate result of the false and misleading representations attributable to Austin Coins, through its principals and telemarketing sales agents, and specifically Lesak, Foster, and Chancey, Mr. Keith has suffered (and continues to suffer) damages arising from and related to the amounts greatly in excess of fair market values he paid for the coins at issue, which has resulted in the theft and conversion of his retirement savings and financial devastation at the hands of the Defendants, as well as mental anguish damages.

**60.** By virtue of the confidential business relationships created and established between Mr. Keith and the self-identified Austin Coins "investment advisors," Lesak, Foster, and Chancey, the Defendants had a duty to disclose the above-described concealed material facts to Mr. Keith. The deliberate silence, when they had a duty to speak, and the resulting nondisclosure of the above-described concealed material facts, are the equivalent of false representations and/or omissions. Such false representations and/or omissions were made knowingly and intentionally by Lesak,

Foster, and Chancey, in both their individual capacities and their capacities as agents, employees, and/or principals of Austin Coins, and with their knowledge and approval, or, at the very least, in reckless disregard of Plaintiff's rights and interests.

**61.** Mr. Keith justifiably relied on the false representations and/or omissions of Lesak, Foster, and Chancey, in both their individual capacities and their capacities as agents, employees, and/or principals of Austin Coins, to his financial ruin. Defendants' wrongful actions constitute fraud at common law.

**62.** Defendants, Lesak, Foster, and Chancey, in both their individual capacities and their capacities as agents, employees, and/or principals of Austin Coins, concealed their wrongful actions with the intent to mislead and defraud Mr. Keith. Mr. Keith was not aware of, nor, through the exercise of due diligence, could he have become aware of Defendants' wrongful actions until such wrongful actions were brought to light by third parties. Due to the Parties' confidential business relationships, which were predicated on their mutual trust and confidence, and Defendants' superior knowledge and/or means of knowledge, Lesak, Foster, and Chancey, in both their individual capacities and their capacities as agents, employees, and/or principals of Austin Coins, had a duty to disclose to Plaintiff the above-detailed materially false information. Defendants' failure to do so constitutes fraudulent concealment under New York law.

### COUNT II
### NEGLIGENT MISREPRESENTATION

**63.** The Plaintiff incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**64.** Defendants made certain representations to Mr. Keith in the course of their business and in transactions in which Defendants had a substantial monetary interest. Defendants negligently

supplied false information that guided Mr. Keith in his decisions to purchase the grossly over-priced coins from Austin Coins.

65.  Defendants failed to exercise reasonable care and competence in obtaining, confirming the accuracy of, and communicating such information to Mr. Keith and/or making the above-described false and material misrepresentations and omissions.

66.  Mr. Keith justifiably relied on Defendants' negligent misrepresentations when he purchased the grossly over-priced coins from Austin Coins, which misrepresentations directly and/or proximately caused him to suffer ruinous damages to the financial benefit of Defendants. Defendants' wrongful conduct constitutes negligent misrepresentation under New York common law.

**COUNT III**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**

67.  The Plaintiff incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

68.  Defendants' actions described herein constitute deceptive acts and practices in the conduct of business, substantially affecting trade or commerce in New York in violation of the New York Consumer Protection from Deceptive Acts and Practices, Gen. Bus. Law § 349.

69.  More specifically, Defendants, individually and through the Austin Coins telemarketer employees and representatives, knowingly and intentionally utilized unlawful, false, misleading, deceptive and unconscionable high-pressure sales tactics and misrepresentations to convince Mr. Keith to purchase grossly over-priced coins from Austin Coins, through one or more of the following deceptive acts or practices, including:

   a.  Holding themselves out as "investment advisors" while having no investment expertise;

19

b. Representing to Mr. Keith that he needed to "follow the plan" and continue buying more coins to add to his portfolio so that his $300,000 investment would significantly increase in value and render him significant retirement income;

c. Misrepresenting attributes, grades, and values of precious metal coins;

d. Claiming that the coins could be held for a short period and then be sold to ready buyers for a large profit;

e. Advising customers to purchase "unique," "rare," and "desirable" bullion coins, when, in fact, there is nothing unique or rare about the coins;

f. Using grading and marketing to deceptively sell bullion at a premium as some type of "modern numismatics" or "signed, graded bullion," even though there are very large populations of the high-grade coins and/or the "certification" is commonly duplicated with minor expense;

g. Misrepresenting the market values of the coins to prevent or delay customers from determining the actual market price of bullion coins;

h. Claiming a volatile market based upon the spot price of gold yet selling numismatic and bullion coins at such exorbitant and fraudulent prices to make "market price" nothing but a gimmick; and

i. Various other acts and practices that may be uncovered during discovery.

**70.** As a direct and proximate result of Defendants' unlawful, unfair, and deceptive acts and practices, Mr. Keith has suffered actual damages of some Two Hundred Forty-Four Thousand Sixty-One and 02/100 Dollars ($244,061.02).

**COUNT IV**
**NEGLIGENCE**

**71.** The Plaintiff incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**72.** Defendants negligently valued, promoted, marketed, advertised, and sold grossly overvalued coins to Plaintiff. This violated and breached Defendants' duty to Plaintiff to exercise reasonable

care in valuing, promoting, marketing, advertising, and selling the coins to Plaintiff. Defendants' wrongful conduct directly and/or proximately caused Plaintiff to suffer damages. Defendants' wrongful conduct constitutes negligence at common law.

## COUNT V
## MONEY HAD AND RECEIVED

**73.** The Plaintiff incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**74.** By their above-described wrongful actions and/or inaction, (1) Defendants received money belonging to Plaintiff, (2) Defendants benefitted from receipt of the money, and (3) under principles of equity and good conscience, Defendants should not be permitted to keep the money. Defendants, therefore, should be compelled to refund such wrongfully charged and collected funds to Plaintiff under the equitable doctrine of money had and received.

## COUNT VI
## UNJUST ENRICHMENT

**75.** The Plaintiff incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**76.** Defendants (and possibly other persons and entities, including Defendants' employees and representatives) have been unjustly enriched by selling Plaintiff coins at exorbitant markups for prices far above any recognized, reasonable, industry-standard market values and enriching themselves thereby. Accordingly, Plaintiff seeks to impose a constructive trust over (and recover) all amounts by which Defendants (and possibly other persons and entities, including Defendants' employees and representatives) have been unjustly enriched.

## COUNT VII
## ALTER-EGO

**77.** The Plaintiff incorporates by reference the preceding paragraphs, including specifically all

factual statements and allegations therein, as though fully copied and set forth below at length.

**78.** Alter-ego liability is established upon a showing that a defendant has complete domination of a corporation in respect to the transaction at issue and that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury. Because a decision to pierce the corporate veil will necessarily depend on the attendant facts and equities of the case at issue, there are no definitive rules governing the circumstances when this power may be exercised.

**79.** Based upon information and belief, each of the individual Defendants, White, Paradise, Schmidt, Lesak, Foster, and Chancey, individually and collectively, use the corporate form of Austin Coins as an alter-ego and as a mere tool or business conduit. The individual Defendants completely dominate Austin Coins to shield assets and thus cause a diminution of available resources from which Plaintiff may obtain satisfaction of the damages directly and/or proximately caused by Defendants' wrongful conduct. Upon information and belief, there are undocumented funds transfers between Austin Coins and the Defendants, and there is an unclear allocation of profit and losses between Austin Coins and the Defendants. In short, Austin Coins is substantially one and the same with White, Paradise, Schmidt, Lesak, Foster, and Chancey, or some of them, and the relationship between them is an illegitimate use of the corporate form.

## VIII
## RESPONDEAT SUPERIOR

**80.** The Plaintiff incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**81.** Defendant Austin Coins also is liable for the above-detailed wrongful acts committed by its principals, agents, representatives, and employees during the course and scope of their agency/employment by Austin Coins; to wit, the principals', agents', employees', and representatives' wrongful conduct was committed (i) within their general authority, (ii) in

22

furtherance of Austin Coins' business, and (iii) to accomplish the objective for which the principals/agents/employees/representatives were retained, all of which directly and/or proximately caused Plaintiff to suffer damages to the financial benefit of Defendants—and for which Defendant is liable under the doctrine of *respondeat superior*.

## RELIEF REQUESTED

**82. RECISSION**.  Based on Defendants' above-described wrongful conduct, Plaintiff is entitled to recission of the transaction(s) at issue by which Defendants fraudulently marketed and sold the grossly overvalued coins to Plaintiff. All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

**83. ACTUAL AND CONSEQUENTIAL DAMAGES.**  As direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered (and continues to suffer) damages in the form of, inter alia, the amounts paid to Defendants for the coins in excess of their value. Plaintiff is entitled to recover consequential damages related to lost investments when he was lured into liquidating his retirement account to purchasing the coins and the mental anguish he has suffered in connection with these transactions—in an amount to be determined by the trier of fact.  All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

**84. TREBLE DAMAGES.**  Plaintiff also is entitled to treble damages for Defendants' knowing, willful and intentional wrongful conduct in violation of New York's GBL § 349 (up to the applicable cap).  All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

**85. EXEMPLARY DAMAGES**.  Defendants' wrongful actions (and failure to disclose such wrongful actions) were committed intentionally, willfully, with malice and/or with conscious and/or reckless disregard for Plaintiff's rights and interests.  Accordingly, Plaintiff also is entitled

to an award of punitive damages against Defendants, both as punishment and to discourage such wrongful conduct in the future.

**86.  ATTORNEYS' FEES, LITIGATION EXPENSES AND COSTS**.  Plaintiff also is entitled to recover his reasonable and necessary attorneys' fees, litigation expenses and court costs actual damages to be determined by the trier of fact.

**WHEREFORE,** Plaintiff requests that upon final trial or hearing, judgment be awarded in his favor against the Defendants, jointly and severally for:

(i)     actual damages to be determined by the trier of fact;

(ii)    punitive damages;

(iii)   treble damages;

(iv)    all amounts by which Defendants have been unjustly enriched;

(v)     an equitable accounting for all benefits, consideration and profits received, directly or indirectly, by Defendants, including imposing a constructive trust, the voiding of unlawful transfers, and the disgorgement of all ill-gotten gains and profits;

(vi)    an injunction prohibiting Defendants' unlawful acts and practices;

(vii)   pre- and post-judgment interest at the highest legal rates;

(viii)  attorneys' fees and litigation expenses incurred through the trial and any appeals of this case;

(ix)    costs of suit; and

(x)     such other and further relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all of his claims and causes of action so triable.

Dated: Thornwood, New York
         December 22, 2023

**LAW OFFICES OF KENNETH G. WALSH**

By:  /s/ Kenneth G. Walsh_____
         Kenneth G. Walsh (1654)
         59 Kensico Road, Suite 7
         Thornwood, New York 10594
         (929) 241-7307
         *kwalsh@kgwalshlegal.com*

         -and-

         **STEVENS LAW FIRM**

         R. Lyn Stevens (pro hac vice forthcoming)
         210 Clearview Avenue, Suite C
         Friendswood, Texas 77546
         (409) 880-9714
         *Lyn@Stevens.Law*
         Texas Bar No. 19189020

         *Attorneys for Plaintiff,*
         *Earl E. Keith*